**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

EGYY MERCADO,

                        Plaintiff,

            - *against* -

WILLIAM F. RYAN COMMUNITY HEALTH
CENTER, INC. d/b/a RYAN HEALTH,

                     Defendant.

-----------------------------------------------------------------------X

**Case No.: 21-cv-3424**

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff EGYY MERCADO, by her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendant, upon information and belief, as follows:

**NATURE OF THE CASE**

1.      Plaintiff complains pursuant to **The Americans with Disabilities Act of 1990**, 42 U.S.C. § 12101, *et seq*. ("ADA"), the **Family and Medical Leave Act**, 29 U.S.C. § 2601, *et seq*. ("FMLA"), the **Age Discrimination in Employment Act of 1967**, as amended ("ADEA"), the **New York State Human Rights Law**, New York State Executive Law § 296, *et seq*. ("NYSHRL"), and **New York City Human Rights Law**, New York City Administrative Code § 8-107 *et seq*. ("NYCHRL"), and seeks damages to redress the injuries Plaintiff suffered as a result of being **discriminated** against on the basis of her **age, disability, familial status and caretaking responsibilities** and **terminated** by her employer in **retaliation** for taking a legally protected leave of absence.

**JURISDICTION AND VENUE**

2.      Jurisdiction of this Court is proper under 28 U.S.C. §§1331, 42 U.S.C. §2000e-5(f)(3), and 29 U.S.C. § 2617.

3.     The Court has supplemental jurisdiction over the claims of Plaintiff brought under state and city laws pursuant to 28 U.S.C. §1367.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the actions or omissions giving rise to the claims for relief, occurred within this judicial district.

## PROCEDURAL PREREQUISITES

5.     Plaintiff timely filed a complaint, upon which this Complaint is based, with the New York State Division of Human Rights ("SDHR") and her complaint was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC").

6.     Plaintiff received a Notice of Right to Sue from the EEOC, dated January 19, 2021, concerning the herein charges of discrimination. A copy of the Notice is annexed hereto.

7.     This action is being commenced within 90 days of receipt of said Notice of Right to Sue.

## PARTIES

8.     Plaintiff EGYY MERCADO (hereinafter "Plaintiff") is 45 years-old and a resident of the State of New York, New York County.

9.     At relevant all times, Plaintiff was employed as a Licensed Practical Nurse by WILLIAM F. RYAN COMMUNITY HEALTH CENTER, INC. dba RYAN HEALTH, at their headquarters location at 110 West 97th Street, New York, New York.

10.     Defendant WILLIAM F. RYAN COMMUNITY HEALTH CENTER, INC. dba RYAN HEALTH (hereinafter, "Defendant") is a domestic, not-for-profit corporation engaged in the business of healthcare services.

11.     Defendant is an "employer" under the relevant statutes and employs more than 50 employees within a 75-mile radius of Plaintiff's workplace.

12.     At all relevant times, Plaintiff was an employee of Defendant.

2

## MATERIAL FACTS

13.     On August 23, 2017, Plaintiff began working for Defendant as a Licensed Practical Nurse. Her employment commenced with a probation period of three months.

14.     Notably, during Plaintiff's job interview before being offered the position, she disclosed that she was five months pregnant and also suffered from a medical condition.

15.     In or about September 2017, Plaintiff complained to her supervisor, Indira Cordero ("Cordero"), that she was being bullied by a co-worker. Cordero seemed pleased with Plaintiff's complaint and responded, in sum and substance, "Great. I can use your complaint against her to try to get rid of her," adding, "She is old [and] always complaining about pain."

16.     Cordero asked Plaintiff to email her a formal complaint by email. When Plaintiff did so, Cordero seemed displeased, and remarked that the complaint was not strong enough.

17.     During Plaintiff's probation period, she received strong job performance reviews and positive feedback from patients.

18.     On October 2, 2017, Plaintiff's probation period ended, and she began working for Defendant as a full-time employee, earning $29 per hour.

19.     Meanwhile, Cordero told Plaintiff to speak with Associate Director of Human Resources, Jemima Fernández ("Fernández") about the bullying co-worker. Cordero attempted to coach Plaintiff on what to say to Human Resources ("HR"), telling her to exaggerate the details so that Defendant would have an excuse to fire the older co-worker.

20.     During the meeting with HR, Fernández read aloud an emailed complaint that was purportedly written by Plaintiff but had been significantly altered and included statements that Plaintiff did not make, such as claims that she felt unsafe at work due to the co-worker and feared for her life.

21.     Plaintiff confirmed that she did not write the email and felt it was an exaggeration. Fernández abruptly ended the meeting and directed Plaintiff to return to her jobsite.

22.     Shortly after Plaintiff's meeting with Fernández, Cordero asked Plaintiff how the meeting went. Plaintiff told her that it went okay, to which Cordero replied that she and Fongho were going to get rid of most of the nursing staff because "they were old and lazy."

23.     In or about November 2017, Plaintiff again complained about bullying from co-workers. When Cordero and Executive Director Bob Fongho met with Plaintiff about her complaints, they told her to learn to defend herself, and went on to say that Plaintiff should not worry because they were getting rid of all of the "old" nurses because they "looked old" and had "low productivity."

24.     Throughout her employment with Defendant, her supervisors often remarked about a link between employees' ages and their job performance.

25.     In November 2017, Plaintiff recommended a former co-worker of hers who had also previously worked with Cordero for a medical assistant position with Defendant. Cordero responded, "Hell no, Bob would kill me. I don't want any old nurses, we are trying to get rid of the ones we have."

26.     Plaintiff replied that she was the same age as the person she was recommending, to which Cordero responded, "But you don't look like it." Cordero then warned Plaintiff not to call out (i.e., not to use paid time off), always arrive on time at work, not get "slow," and try not to get sick.

27.     Thereafter, Plaintiff began to feel that she was under increased scrutiny by management due to her age.

28.     Because age was always an issue with her supervisors, Plaintiff felt compelled to outperform her younger colleagues, even though her advanced maternal age made her pregnancy

a risky one.

29.     When Plaintiff asked Cordero for help carrying heavy boxes for long distances, Cordero -- instead of arranging for assistance for a pregnant employee being asked to move heavy boxes -- told her to push the heavy boxes with her feet.

30.     Upon information and belief, Cordero did this in retaliation for Plaintiff's failure to cooperate in trying to rid Defendant of an older nurse.

31.     In December 2017, Plaintiff prepared for her maternity leave, which she planned to begin on December 15, 2018.

32.     On or about December 13, 2017, Cordero advised Plaintiff that HR Representative Ivette Fuentes had stated that Plaintiff would have to restart her probationary period when she returned from maternity leave.

33.     Plaintiff called Fuentes and she confirmed that Plaintiff would have to restart her probationary period when she returned from maternity leave. She also stated that Plaintiff was not entitled to any pay while on leave.

34.     On or about December 14, 2017, when Plaintiff was nine months pregnant, she experienced pregnancy-related pains. Plaintiff told Cordero about the pain; however, Cordero looked upset and responded, "You better not tell me you are not coming in tomorrow. I have no one else to do vaccines but you. You better come in to work tomorrow."

35.     On December 23, 2017, Plaintiff gave birth with an emergency induction due to complications.

36.     Plaintiff then commenced maternity leave.

37.     On February 26, 2018, Plaintiff returned to work from maternity leave. Upon her return, Plaintiff noticed that all of the older nurses were no longer employed by Defendant and had been

replaced by nurses aged in their twenties.

38.     During her leave, Defendant hired nurse supervisor, Marlene Zapata ("Zapata"), who Plaintiff had worked with at her previous job.

39.     Upon seeing Plaintiff, Zapata mentioned Plaintiff's illness in front of Cordero stating, "It is so great to see you doing better. Last time I saw you, you looked disoriented and very skinny," referring to symptoms and effects of Plaintiff's medical condition, Maniere's disease.

40.     From then on, Plaintiff noticed a change in the demeanor of Cordero and Fongho towards her. They stopped greeting Plaintiff and avoided eye contact with her at the workplace.

41.     In March 2018, Cordero informed Plaintiff that Plaintiff would begin working with a doctor instead of administering vaccinations. Shortly after this change, Defendant hired a new nurse, aged approximately in her twenties, Yliana Liriano ("Liriano"), to administer vaccinations.

42.     Liriano routinely called in sick to work and repeatedly asked Plaintiff to cover for her. Plaintiff advised Liriano that she should not call out so often because Defendant had just hired her; however, Liriano responded that she doubted anyone would discipline her.

43.     Other new nurses also frequently called out of work but faced no discipline. Judy Aristy routinely called out of work due to relationship problems with her boyfriend or because she drank too much alcohol the night before. Cordero and Fongho were aware that Aristy called out of work for these reasons but did not discipline her. However, Plaintiff faced discipline and ridicule from management when she called out of work.

44.     For example, when Plaintiff called out one day to care for her daughter when she was ill, Plaintiff was reprimanded.

45.     In addition, Plaintiff was not assigned overtime shifts she requested. The shifts were given to younger nurses, even though overtime was supposed to be assigned by seniority and Plaintiff

777043d9dba3ba39

had greater seniority than these younger nurses.

46.    In May 2018, Plaintiff asked Fuentes when her probationary period would end so that she could access her health benefits. Fuentes replied that she was unsure. Plaintiff then called Defendant's benefits provider, who informed her that her probationary period had ended in March 2018 but refused to provide her benefits information because HR failed to inform them that she completed her probationary period.

47.    On June 4, 2018, Plaintiff sustained a deep laceration on her hand that was exacerbated by her neurological condition. The pain caused Plaintiff to call out of work one day but she returned to work the following day.

48.    Upon returning to work, Plaintiff found the pain to be unbearable and was forced to call out of work the next day. Zapata responded by telling Plaintiff that it was unacceptable to call out of work twice in the same week and that Fongho did not care if she was sick or injured.

49.    Although about four other nurses called out on the very same day that Plaintiff did, Plaintiff was the only nurse to be threatened and disciplined.

50.    Despite the fact that Plaintiff had accrued, unused sick days, Zapata told Plaintiff that Fongho would not tolerate any more sick-days from Plaintiff.

51.    Plaintiff told Zapata that she was not being treated as other nurses were and felt that she was being singled out for discipline.

52.    Instead of responding to Plaintiff's complaint, management instead issued write-ups to Plaintiff for her June 2018 absences.

53.    On July 9, 2018, Plaintiff experienced problems related to her medical condition and needed to call out sick.

54.    In July, Cordero and Zapata told Plaintiff that she would be written up for her absences.

Plaintiff asked why she would be written despite her strong attendance record. Cordero and Zapata told Plaintiff that Fongho ordered it because she had not come in on a day that other nurses had called out.

55.    Cordero and Zapata warned Plaintiff that another absence would result in another write-up and three write-ups would be grounds for termination.

56.    On July 12, 2018, Defendant issued Plaintiff a disciplinary memorandum for calling out sick. Plaintiff refused to sign the document without the presence of her union representatives.

57.    In July 2018, Plaintiff contacted the EEOC for assistance. An EEOC representative suggested that Plaintiff inquire about and apply for intermittent FMLA leave.

58.    On August 20, 2018, Plaintiff's neurologist advised her that she could continue working while she was not experiencing symptoms, but that she does qualify for intermittent FMLA leave for the times when her illness flared up, and filled out the appropriate paperwork for intermittent leave.

59.    When Plaintiff submitted the FMLA documents to Fongho he appeared angry and asked her, "Who told you about this?" and "Who told you can submit these documents?"

60.     Plaintiff told Fongho that Cordero had mentioned intermittent FMLA and that she had a pre-existing health condition. Fongho replied, "I don't care about your pre-existing health condition" and "I don't have to accept this."

61.    Fongho told Plaintiff that he was going to send her to a doctor to verify her medical condition. Plaintiff told Fongho that she had been seeing her own neurologist regarding her condition for years. Fongho told Plaintiff that whoever had spoken to her about intermittent FMLA leave would be in "big trouble."

62.    Fongho ended the meeting with Plaintiff by angrily telling her to take her papers and leave.

63.     In the following days, HR Manager, Arlene Carmona ("Carmona"), told Plaintiff that she needed additional documentation to support her request for intermittent FMLA leave. Plaintiff supplied it.

64.     Two days after submitting those forms, Carmona approached Plaintiff while she was working at the nurse's station and, in the presence of colleagues said, in sum and substance, "You know, we don't feel it's safe for you to be here." When Plaintiff replied that she was fine, Carmona said, in sum and substance, "We are concerned and think you should not be here at work." Despite Plaintiff' protestations, Carmona repeated, in sum and substance, "We just don't feel it is safe. What if you have an attack right now?"

65.     After that incident, Plaintiff was constantly monitored by Liriano or another new nurse who had been hired as the new Lead LPN, Rebecca. Although Plaintiff was significantly more experienced than those nurses, they constantly micromanaged and questioned Plaintiff.

66.      Liriano would make comments to Plaintiff such as "Are you ok?" or "You look dizzy, out of it today." Liriano would also ask if Plaintiff had taken medication and what medication she was taking.

67.     In September 2018, Defendant hired another nurse to administer vaccinations and forced Plaintiff to train her.

68.     On or about September 21, 2018, when Plaintiff was scheduled for an overtime shift the following day, Defendant removed Plaintiff from the schedule and scheduled a medical assistant in her place, despite needing a nurse to administer medications during those shifts.

69.     In September of 2018, Plaintiff had a family emergency and notified the supervisor in charge that day, Acting Director of Nursing, Jessina Wachtelhausen, that she had to leave at once.

70.     Wachtelhausen initially refused to allow Plaintiff to leave to attend to her family crisis.

Wachtelhausen put Plaintiff in an office and instructed her to wait there. Although Plaintiff informed Wachtelhausen that her son had been injured, Wachtelhausen refused to allow Plaintiff to leave. Wachtelhausen told Plaintiff that, if she left, she risked losing her job. Wetchelhausen eventually let Plaintiff leave, but only after Plaintiff spoke to multiple other supervisors. In contrast, Plaintiff was aware of multiple occasions when other nurses were permitted to leave work early without delay.

71.    On September 28, 2018, Fernández called Plaintiff into her office and told her that Defendant would be placing her on medical leave until it could clarify her medical condition. Fernández stated that she did not feel safe with Plaintiff in the workplace and required additional information from Plaintiff's neurologist, despite the fact that Plaintiff had been cleared for work by her doctor twice already.

72.    Fernández told Plaintiff to clean out her locker and to submit new intermittent FMLA documents by October 29, 2018. Fernández stated that if she did not hear from Plaintiff by that date, she would assume Plaintiff would not be complying.

73.    Plaintiff was thereby forced to take sick leave and use her accrued time for it.

74.    On October 19, 2018, Plaintiff provided Fernández further medical documentation proving she was capable of working; however, Fernández requested yet further information and continued to require Plaintiff to be on leave.

75.    On November 7, 2018, Plaintiff went to pick up new medical documentation from Defendant and was advised that Fuentes had misinformed her when she stated Plaintiff could not receive compensation during her maternity leave. Fuentes had intentionally misrepresented to Plaintiff her eligibility for benefits and failed to inform her that her probationary period had ended in March 2018, causing Plaintiff to miss out on further health benefits. Although Plaintiff applied

for benefits once she learned she had been eligible, her application was rejected as too late.

76.     In or about November 2018, Defendant required Plaintiff to complete a new set of medical questionnaires although her doctor had repeatedly informed Defendant that Plaintiff was cleared to work.

77.     Subsequently, after Plaintiff's then-attorney contacted Defendant, Defendant finally cleared Plaintiff to return to work on November 19, 2018.

78.     Upon returning to work, Defendant changed Plaintiff's schedule and job duties. Defendant prohibited Plaintiff from administering vaccinations despite multiple clearances provided by her doctor. Defendant changed Plaintiff's hours knowing that it was difficult for her to work an earlier shift due to needing to take her children to school. Defendant assigned Plaintiff to work with a difficult doctor who is extremely fast-paced, despite the fact that Plaintiff's previous experience was mostly administering vaccinations.

79.     Plaintiff's co-worker told her, in sum and substance, "Oh, they are giving you hell; they put you to work with Dr. Hailey because you just got back from medical leave and she has reported two nurses already for not working well or being slow, the supervisors are setting you up."

80.     Defendant continued to permit absences from other employees for reasons not related to disabilities, despite admonishing Plaintiff for absences related to her illness.

81.     Cordero informed Plaintiff that she had no sick time and must schedule her doctor appointments once she had accumulated more time. Cordero further stated, in sum and substance, "If you cannot come to work by 10 a.m., don't bother coming."

82.     On November 29, 2018, Plaintiff was reprimanded regarding a urine specimen that was processed by a different employee.

83.     Additionally, Defendant held a meeting as a result of Plaintiff's absences despite her providing medical documentation in support of the need for absences.

84.     In December 2018, Plaintiff filed a HR complaint against Liriano, noting that Liriano often made disparaging comments about Plaintiff's age, such as, in sum and substance, "Why do you work so many hours? Someone your age should go home and rest." And "We forget you just had a baby; it's strange to see someone your age still having kids."

85.     Upon information and belief, Liriano was never disciplined for her ageist comments to Plaintiff or any of her other inappropriate behavior toward Plaintiff.

86.     In or about December 2018, Plaintiff filed a complaint with HR and against Cordero and Fongho for discrimination.

87.     In January 2019, Defendant summoned Plaintiff for a meeting without providing her enough time to make arrangements for a delegate to be present. Cordero and Zapata manufactured pretextual performance issues during the meeting as a form of retaliation against Plaintiff. They accused Plaintiff of documentation errors, unprofessional and disrespectful behavior, including but not limited to: slamming doors, snatching a glue stick out of Zapata's hand, and trying to convince other nurses to file complaints against Liriano.

88.     The accusations against Plaintiff were fabricated and baseless. Plaintiff questioned why these issues were never previously addressed by Defendant. Plaintiff had always conducted herself in a professional manner and never slammed the door leaving an office, nor did she snatch a glue stick out of Zapata's hand.

89.     Additionally, they accused Plaintiff of being rude with a doctor; however, Plaintiff always remained professional with the doctor in question, even when he yelled at her in the middle of the hallway.

90.     Defendant continued to rearrange Plaintiff's schedule without providing notice and refused to post her on the actual schedule.

91.     On February 25, 2019, Plaintiff disclosed to Defendant that she was again pregnant.

92.     On March 13, 2019, Plaintiff's neurologist advised that she take a medical leave because she was experiencing some pregnancy complications and her Meniere's condition was exacerbated.

93.     Plaintiff submitted medical documentation corroborating her need for leave accordingly; however, Defendant continued to seek additional information. Plaintiff's doctor had previously answered the questions and provided the information that Defendant requested again.

94.     Despite Plaintiff's sensitive situation and doctor's recommendation that she stay home and rest, Defendant demanded that she provide additional information, knowing that she would have to travel to her doctor in order to provide the extraneous information requested. Plaintiff's doctor also had limited availability to see her, which in turn delayed the submission of her paperwork. Defendant threatened Plaintiff that if she did not submit the additional information by March 19, 2019, that she would be facing disciplinary action.

95.     On May 21, 2019, Plaintiff's medical benefits were suspended.

96.     On May 26, 2019, despite Plaintiff's already having submitted the necessary documentation for disability and FMLA leave, Defendant advised that it did not have such forms within Plaintiff's file.

97.     In or about August 2019, Plaintiff was told she was not eligible for paid maternity leave because she had taken disability leave during her pregnancy.

98.     In September of 2019, Plaintiff gave birth prematurely. She then took maternity leave, which was unpaid.

99.     In January of 2020, as Plaintiff neared the end of her maternity leave, Fernández emailed her to ask when she would go back to work. Plaintiff provided her with a January date.

100.    Defendant proceeded to complicate Plaintiff's return to work. Defendant insisted that Plaintiff have her neurologist complete a new questionnaire. Defendant informed Plaintiff that she could not be cleared to work unless she had it completed.

101.    Plaintiff's neurologist recommended that she obtain workplace accommodations for her disability. Those accommodations included no heavy lifting, no standing for more than thirty minutes, and no exposure to bright lights.

102.    The accommodations would not pose an undue hardship on Defendant as Plaintiff did not normally lift heavy objects, never stood for more than thirty minutes, and had access to dimly lit rooms on the job.

103.    Fernández initially rejected the documentation from Plaintiff's neurologist, stating that the forms were illegible. Fernandez later claimed that the accommodations could not be met.

104.    Plaintiff offered to have her neurologist speak directly with HR but no one in HR was ever available for a call.

105.    In or about March 2020, Plaintiff received an email stating that, due to the COVID-19 pandemic, she was required to return to work immediately and, since she had not provided them with the medical clearance they needed, she was terminated.

106.    Based on the foregoing, Defendant discriminated against Plaintiff based on age, and disability and also subjected her to unlawful retaliation.

107.    Defendant treated Plaintiff differently than similarly-situated employees without her age or disability with respect to their terms and conditions of employment. These actions of discrimination and retaliation substantially interfered with Plaintiff's employment.

108.    As a result of Defendant's unlawful discriminatory and retaliatory practices, Plaintiff suffered significant financial ramifications, humiliation, outrage, and mental anguish for which Plaintiff claims compensatory damages.

109.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

110.    Plaintiff's protected activity put Defendant on notice that she was requesting a reasonable accommodation for her illness.

111.    However, Defendant failed to make any reasonable accommodation for Plaintiff or offer Plaintiff any information regarding her eligibility for any leave, including under the FMLA.

112.    Plaintiff understood that her termination was in retaliation for requesting accommodations and requesting intermittent medical leave due to her illness, as well as due to her age.

113.    Contrary to the law, Defendant failed/refused to engage in any meaningful interactive process with Plaintiff with respect to her disability accommodation request. Defendant also failed to provide any reasonable accommodation or engage in the interactive process to determine whether a reasonable accommodation could be suggested to Plaintiff

114.    Instead, Defendant terminated Plaintiff's employment.

115.    Defendant does not have a justifiable nor reasonable excuse for terminating Plaintiff's employment.

116.    Defendant's stated reason for terminating Plaintiff's employment was pretextual.

117.    But for Plaintiff's disability, Defendant would not have terminated Plaintiff.

118.    Plaintiff had, and/or Defendant perceived that she had, a physical impairment that substantially limits one or more of her major life activities.

119.    But for Plaintiff's disability, perceived disability and/or need for a reasonable accommodation, Defendant would not have terminated her employment.

120.    Upon information and belief, Defendant is aware of its obligations under the ADA, the FMLA, the NYSHRL, and the NYCHRL.

121.    Defendant is aware of its legal duty and obligation to engage in an interactive process and to assess an employee's need for accommodations when the employee places Defendant on notice of a medical need/disability.

122.    As a result of Defendant's actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

123.    As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other damages. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

124.    Plaintiff was, and remains, a qualified individual who can perform the essential functions of her employment with or without a reasonable accommodation as defined by § 12111(8) of the ADA.

125.    Defendant's conduct was malicious, willful, outrageous, and conducted with full knowledge of the law, and/or violation thereof.

126.    As such, Plaintiff demands punitive damages against Defendant.

**AS A FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER THE ADA**

127.    Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

128.    Plaintiff claims Defendant violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

129.   Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

130.   Plaintiff is physically impaired due to her diagnosis of Meniere's disease.

131.   At all relevant times, Plaintiff was qualified as "disabled" pursuant to the ADA because she was actually impaired as described in 42 U.S.C. § 12102(1)(A).

132.   At all relevant times, Plaintiff was qualified to perform the essential duties of the Licensed Practical Nurse position with the requested reasonable accommodation.

133.   Plaintiff requested reasonable accommodations from Defendant.

134.   Defendant was aware of Plaintiff's disability and need for the accommodations.

135.   Defendant did not make a good faith effort to accommodate Plaintiff's disability.

136.   Defendant discriminated against Plaintiff in violation of the ADA by refusing to accommodate her disability and terminating her employment because of her disability.

137.   Defendant does not have a justifiable reasonable excuse for terminating Plaintiff's employment.

138.   Defendant's failure to accommodate Plaintiff's disability and termination of Plaintiff's employment due to her disability was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

139.   Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights under the ADA when it refused to provide a reasonable accommodation for her disability.

## AS A SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER THE ADA

140.    Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

141.    The ADA prohibits retaliation, interference, coercion, or intimidation against an employee who engages in protected activity.

142.    42 U.S.C. § 12203 provides:

> Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

143.    Plaintiff engaged in protected activity when she asked Defendant for reasonable accommodations for her disability, including the ability to work from home and leave to recover from mental illness.

144.    As a direct result of Plaintiff's request for a reasonable accommodation, Defendant retaliated against Plaintiff by terminating her employment.

145.    Defendant treated Plaintiff less favorably than her similarly situated counterparts who did not engage in protected activity.

146.    Defendant interfered with Plaintiff in the exercise and enjoyment of her rights under the ADA by terminating Plaintiff due to her need for an accommodation.

147.    Defendant's retaliatory conduct was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

148.   Defendant's conduct was with malice or reckless indifference to Plaintiff's federally protected rights under the ADA.

### AS A THIRD CAUSE OF ACTION
### FOR INTERFERENCE UNDER THE FAMILY AND MEDICAL LEAVE ACT

149.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

150.   Section 2612(d)(2)(B) of the FMLA, states in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

151.   Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

> Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

152.   Defendant is an employer covered by the FMLA pursuant to 29 U.S.C. §2601 et seq. because it is a private business that employed fifty or more employees for each working day for at least twenty workweeks in the year prior to Plaintiff's leave.

153.   Plaintiff is an FMLA-eligible employee because she was employed by Defendant for over one year prior to requesting FMLA leave and had been employed by Defendant for over 1,250 hours in the twelve-month period prior to her request.

154.   Plaintiff was entitled to intermittent FMLA leave.

155.   Defendant engaged in prohibited conduct under the FMLA by denying Plaintiff's rights provided under the Act and refused Plaintiff the requested intermittent FMLA leave.

156.    Defendant's action foreclosed Plaintiff's rights under the FMLA, including but not limited to, the right to maintain her position.

157.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered and continues to suffer substantial losses, including past and future lost wages and benefits. Plaintiff is also entitled to liquidated damages and attorneys' fees and costs, and other damages as recoverable by law.

**AS A FOURTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE FAMILY AND MEDICAL LEAVE ACT**

158.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

159.    Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

> Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

160.    Defendant violated these sections as set forth herein.

161.    Upon information and belief, Defendant could have allowed Plaintiff to properly exercise her FMLA leave.

162.    Instead, Defendant interfered with Plaintiff's FMLA rights by taking adverse employment actions against Plaintiff after she requested FMLA leave.

163.    Defendant had no good faith business justification for any of the actions taken against Plaintiff as alleged herein.

164.    As a result of Defendant's actions, Plaintiff was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

165.    Plaintiff is entitled to the maximum damages allowable under this law.

**AS A FIFTH CAUSE OF ACTION**
**UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

166.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

167.    29 U.S.C. § 623(a) provides that it shall be unlawful employment practice for an employer:

> [T]o . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.
> [T]o limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age….

168.    By their actions, Defendant and its agents discriminated against Plaintiff with respect to harassment, hostile environment, wages, promotion, and other terms and conditions of employment, because of age or age plus sex, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et. seq.

169.    As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered and will continue to suffer lost wages, benefits, promotional opportunities, commissions and bonuses and has incurred other damages as a result.

170.    Defendant's actions constitute a "willful violation" of the ADEA, as that term is used in 29 U.S.C. § 626(b), and Plaintiff is entitled to liquidated damages.

**AS A SIXTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

171.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

172.    As outlined above, Defendant violated the ADEA when it retaliated against Plaintiff by taking adverse employment actions against Plaintiff because she engaged in activity protected by the ADEA.

173.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

174.    The foregoing conduct, as alleged, constitutes a willful violation of the ADEA within the meaning of 29 U.S.C § 626(b) and, as a result, Plaintiff is entitled to liquidated damages.

### AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK STATE LAW

175.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

176.    Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's **age**, race, creed, color, national origin, sexual orientation, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

177.    As a result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

178.    Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### AS A EIGHTH CAUSE OF ACTION FOR RETALIATION
### UNDER THE NEW YORK STATE LAW

179.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

180.   Executive Law § 296 provides that, "7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

181.   As described above, after Plaintiff engaged in activity protected by the NYSHRL, Defendant took adverse employment actions against Plaintiff that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

182.   As a result of Defendant's retaliatory conduct in violation of the NYSHRL, Plaintiff is entitled to an award of punitive damages.

### AS A NINTH CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY LAW

183.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

184.   The Administrative Code of City of New York § 8-107(1)(a) provides that

> It shall be an unlawful discriminatory practice: for an employer or an employee or agent thereof, because of the actual or perceived **age**, race, creed, color, national origin, gender, **disability**, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or alienage or citizenship status of any person... to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

185.     As described above, Defendant discriminated against Plaintiff on the basis of her caregiver status and her disability in violation of the NYCHRL by, including but not limited to, subjecting her to disparate working conditions, and denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment.

186.     As a result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

187.     Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### AS A TENTH CAUSE OF ACTION FOR RETALIATION UNDER THE NEW YORK CITY LAW

188.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

189.     The New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice for an employer "to retaliate or discriminate in any manner against any person because such person has opposed any practices forbidden under this chapter…."

190.     As described above, Plaintiff engaged in protected activities, including making internal complaints regarding Defendant's discrimination based on Plaintiff's disability and caretaker status.

191.     As a result of Defendant's retaliatory conduct in violation of the NYCHRL, Plaintiff is entitled to an award of punitive damages.

### JURY DEMAND

192.     Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A.     Declaring that Defendant engaged in unlawful employment practices prohibited by ADA, the FMLA, the ADEA, the NYSHRL, and the NYCHRL in that Defendant discriminated and retaliated against Plaintiff on the basis of her disability and age;

B.     Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination and retaliation, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.     Award Plaintiff liquidated damages pursuant to 29 U.S.C. §2617(a)(1)(A)(iii);

D.     Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

E.     Awarding Plaintiff punitive damages;

F.     Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

G.     Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: New York, New York
         April 19, 2021

                              **PHILLIPS & ASSOCIATES,**
                              **ATTORNEYS AT LAW, PLLC**

                    By:     _____/s/_____
                              Marjorie Mesidor
                              Joseph Myers
                              *Attorney for Plaintiff*
                              585 Stewart Avenue, Suite 410
                              Garden City, New York 11530
                              (212) 248-7431
                              mmesidor@tpglaws.com
                              jmyers@tpglaws.com